IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>AMIR GOLESTAN,<br>MICFO, LLC | Crim. No. 2:19-CR-00441-RMG<br><br><br><br>**GOVERNMENT'S TRIAL BRIEF** |

I.   Factual Summary ........................................................................................................... 2
     A. Internet Protocol Addresses and ARIN ................................................................. 2
     B. ARIN Policy for Assignment or Transfer of IP Addresses .................................... 3
     C. Secondary Market for IP Addresses ...................................................................... 4
     D. Amir Golestan, Micfo, LLC, and Channel Partners .............................................. 5
II.  Nature of the Charges ..................................................................................................... 6
     A. Court's Ruling on Defendants' Motion to Dismiss ................................................ 7
III. Anticipated Trial Proceedings ........................................................................................ 8
     A. Opening Statement ................................................................................................. 8
     B. Witness List and Anticipated Testimony ............................................................... 8
     C. Exhibits ................................................................................................................. 14
     D. Closing Statement ................................................................................................ 14
IV.  Legal Authorities Pertinent to Issues that May Arise ................................................. 14
     A. Charts/Demonstratives ......................................................................................... 14
     B. Summary Exhibit . ............................................................................................... 15
     C. Government's Notice of Intent to Use Evidence as Evidence of Charged Offenses,
        Intrinsic to the Charged Offenses, and/or Pursuant to Rule 404(b) ........................ 17
     V. Conclusion ................................................................................................................ 18

The Government respectfully submits this trial brief to aid the Court in anticipating the evidence and issues expected to arise during trial.

I.     **Factual Summary**

Amir Golestan and Micfo, LLC (collectively, Defendants) have been charged with devising a scheme and artifice to defraud and obtain property, specifically IPv4 address rights from ARIN, by means of false and fraudulent representations.

A.     **Internet Protocol Addresses and ARIN**

An Internet Protocol (IP) address is numerical label assigned to each device connected to a computer network that uses the IP, or the Internet, for communication. IP addresses serve two basic functions – (1) host or network identification and (2) location addressing. The American Registry for Internet Numbers (ARIN) is a nonprofit organization that administers IP addresses. ARIN is a Regional Internet Registry (RIR)[1] and component of the Internet Assigned Numbers Authority (IANA). The IANA delegates Internet resources to RIRs who, in turn, follow regional policies to delegate resources to their customers. Customers include, but are not limited to, internet service providers and end-user organizations who utilize IP addresses in their businesses or enterprises.

IP uniqueness was first established by the U.S. government. Prior to 1997, the National Science Foundation (NSF) was responsible for IP number allocation and registration. In 1997, the U.S. government approved the transfer of its duties and responsibilities from NSF and ARIN. As

---

[1] ARIN is one of five RIRs, and is the RIR for the United States, Canada, and many Caribbean and North Atlantic Islands.

a result of this transfer, ARIN inherited all the duties and responsibilities concerning the allocation and registration of IP addresses formerly performed by the U.S. government.

Internet "traffic" is routed through IP addresses. The addresses use a series of decimal numbers separated by periods. The IP addresses have gone through several versions, most recently versions four (IPv4) and six (IPv6). IPv4 was depleted at a rate not initially anticipated in the original design of the address system and by 2011 the global IPv4 pool was exhausted. Despite the global exhaustion, ARIN still had its own free pool of IPv4 addresses available. A long-term solution to the IPv4 depletion was created in the form of IPv6, which provides increased address space; however, the two systems are not universal and IPv6, alone, does not provide an immediate solution to IPv4 exhaustion.

### B.     ARIN Policy for Assignment or Transfer of IP Addresses

Part of ARIN's responsibilities include allocating IP resources, specifically the allocation, assignment, and transfer of rights to IPv4 and IPv6 addresses. ARIN has specific processes and policies that must be followed before rights to an IP address can be assigned or transferred. ARIN's Number Policy Resource Manual (NPRM) sets forth these processes and policies.

Broadly speaking, for an organization to request IP resources and registration rights, it must submit a request to ARIN, provide documentation showing need for the resources in accordance with the NPRM, and enter into a registration services agreement (RSA) with ARIN. Because of the demand for IPv4 addresses, ARIN often required justification and customer identification for additional IPv4 address blocks to verify that the request was valid. ARIN often has a waitlist for IPv4 addresses.

An entity and/or business who had been granted the rights to IP addresses from ARIN also had submit any transfer requests to ARIN for approval. ARIN's NPRM manual sets forth the processes and policies for the transfer of a customer's right to an IP address to another customer and "number resources are not transferrable and are not assignable to any other organization unless ARIN has expressly and in writing approved the transfer request." *See* ARIN NPRM § 8.1. For example, if an entity receives a "transfer, allocation, or assignment of IPv4 number resources from ARIN," it cannot transfer the IP address for a 12-month period. ARIN NPRM § 8.3.

C. **Secondary Market for IPv4 addresses**

As a result of the demand, depletion, and, now, exhaustion of IPv4 addresses, a secondary market was created for the transfer of the rights to IP address blocks. The value of the right to an IP address on the secondary market has changed as the demand has increased. In 2017, the market rate for an IP address right ranged from $9 to $13. The rate has increased significantly since then, and the value of an IP address right fluctuates based on the market as well as the prior usage of the specific IP address right that is being sold.

Brokers are often used to facilitate the sale and transfer of the rights to IP address blocks between businesses. Brokerage companies that were involved in the rights to IP address blocks at issue in the present case include Hilco Streambank, Nationwide Computer Systems, Inc., IPv4 Market Group, and Cheval Capital.

ARIN must approve all transfer requests and its policies and procedures dictate whether rights to IP address blocks can be sold on the secondary market. For instance, as discussed above, rights to an IP address block cannot be sold on the secondary market if it had been assigned within the last 12 months. *See* ARIN NPRM § 8.3.

4

D.   **Amir Golestan, Micfo, LLC, and Channel Partners**

Micfo, LLC (Micfo) is a business that represents itself as providing hosting services and providing customers with technologies and services needed for a website or webpage to be viewed on the Internet. As part of its business, Micfo applied and registered for IPv4 addresses through ARIN. Golestan started Micfo in 1999, and owned and operated Micfo throughout the existence of the business.

From February 2014 to the time Amir Golestan (Golestan) and Micfo were indicted, Golestan and Micfo created and utilized Channel Partner companies to obtain the rights to IP addresses that they could not legally obtain. The Channel Partner companies purported to be individual businesses, which required IP address rights, and would apply directly to ARIN for the IP address rights. Specifically, the Channel Partners would complete and notarize ARIN paperwork, which included the identification of officers, and provide justification for the Channel Partner's need for IP address rights. Golestan created fictitious persons, represented to be officers or others acting on behalf of the Channel Partners, for each Channel Partner company. The following Channel Partner companies and individuals, among others, were created and used by Golestan and Micfo:

| Company | Fabricated Individual(s) |
| --- | --- |
| Contina | John Liberman |
| Virtuzo | Jeff Farber/Mark Schmidt |
| Oppobox | Kevin Chang |
| Telentia | Yong Wook-Kwon |
| Univera Network/HostAware | Steve Cunningham |

| Roya Hosting | Brian Sherman |
| --- | --- |
| Host Bang | Ahmad Al Bandi |
| Hyper VPN | Sebastian Buszewski |
| Fiber Galaxy | Pooya Torabi |
| Cloudiac | Paul Lampert |

Part of the scheme was to represent to ARIN, when applying for IP address rights, particular aspects about the Channel Partner company applying. Golestan at times would set forth who the officers were, information regarding the Secretary of State registration, and would submit to ARIN sworn affidavits representing facts about the business, all set forth and often signed by fictitious individuals. Golestan at times would also create web pages and email addresses for these fictitious individuals and Channel Partner companies to make the companies look legitimate and make it look like the individuals did in fact run the companies. Using the Channel Partners, either individually or on applications for Micfo, as justification, Micfo and Golestan were granted the rights to hundreds of thousands of rights to IPv4 addresses from ARIN. Golestan and Micfo then sold the rights to many of these IP addresses to third parties, making a significant profit from their scheme.

## II.     Nature of the Charges

The Defendants are charged in a twenty-count Indictment alleging violations of 18 U.S.C. § 1343 for knowingly devising and intending to devise a scheme and artifice to defraud and obtain

property, specifically IPv4 address rights from ARIN, by means of false and fraudulent pretenses, representations, and promises.[2]

Title 18, United States Code Section 1343 makes it a crime for a person to use interstate wire communications to execute a scheme to defraud. *See* Eric Wm. Ruschky, *Pattern Jury Instructions for Federal Criminal Cases* § 1343 (District of South Carolina Online Edition 2020).[3] To find the Defendants guilty under 18 U.S.C. § 1343, the Government must prove each of the following beyond a reasonable doubt:

1. First, that the Defendants devised or intended to devise a scheme to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises that were material; and

2. Second, that for the purpose of executing the scheme, the Defendants transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce any writings, signs, signals, pictures, or sounds.

Under the wire fraud statute, the element to defraud has the "common understanding of wronging one in his property rights by dishonest methods or schemes and usually signify[ing] the deprivation of something of value by trick, deceit, chicane, or overreaching." *United States v. Wynn*, 684 F3d 473, 477 (4th Cir. 2012).

     **A.**    **Court's Ruling on Defendants' Motion to Dismiss**

In September 2019, Defendants filed a Motion to Dismiss the Indictment arguing that the Indictment failed to state an offense. ECF No. 46. First, Defendants argued that the Indictment failed to allege a "scheme and artifice" to defraud. Second, Defendants argued the Indictment

---

[2] The Government would refer the Court to its Indictment, ECF No. 2, for the details for each of the twenty counts.
[3] https://www.scd.uscourts.gov/pji/.

failed to allege "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." In July 2021, this Court denied Defendants' motion. ECF No. 75.

In this Court's order denying Defendants' motion, it held that IP addresses are "property," as contemplated by the wire fraud statute. Moreover, this Court found that the Indictment sufficiently set forth a "scheme and artifice to defraud" because the Indictment charged Defendants with fraudulently obtaining the rights to IP addresses, which deprived ARIN of "something of value."

### III.  Anticipated Trial Proceedings

In an effort to assist the Court with organizing trial proceedings, the Government anticipates the following organization of its case-in-chief. The Government is represented by AUSAs Nathan Williams and Amy Bower.

The Government has met with defense counsel to discuss what the Government and defense plan to present at trial and has presented defense counsel with a refined witness and exhibit list as well as electronic, labelled copies of all proposed trial exhibits.

#### A.  Opening Statement

AUSA Nathan Williams will present the Government's opening statement. The Government anticipates this opening statement will last approximately 20 minutes. The Government anticipates utilizing a summary exhibit during the opening statement.

#### B.  Witnesses

The following are the Government's expected witnesses, expected time of testimony and a general description of the anticipated testimony. The witnesses are listed in the order the

Government anticipates presenting them; however, the Government may have to take one or two witnesses out of order based on witness travel schedules and conflicts.

    1)    <u>John Sweeting, Senior Direct of Registration Services, ARIN</u>

Mr. Sweeting is the Chief Customer Officer for ARIN and is the Former Elected Chairman of the ARIN Advisory Council. Mr. Sweeting's direct will be handled by AUSA Williams and is anticipated to last 3 to 4 hours.

Mr. Sweeting will testify as both a fact and expert witness. As it relates to Mr. Sweeting's fact and expert testimony, the Government would refer the Court to its Rule 16(a)(1)(G) Supplemental Notice of Expert Witness. ECF No. 92. Broadly speaking, as a fact witness, Mr. Sweeting will testify to the activities of Defendants with ARIN. The Government has conferred with defense counsel and understands there to be no objection to Mr. Sweeting testifying as a fact and expert witness.

    2)    <u>Jack Hazan, Hilco Streambank</u>

Mr. Hazan is the Executive Vice President of HilcoStreambank. Mr. Sweeting's direct will be handled by AUSA Bower and is anticipated to last 30 minutes to 1 hour.

HilcoStreambank is one of the brokerage companies that was involved in Defendants selling of IP address block rights that were fraudulently obtained from ARIN. Specifically, HilcoStreambank was involved in two potential IP address block sales and transfers: (1) CUBL and (2) Saudi Telecom. Mr. Hazan will testify about the details of these attempted transactions, his dealings with Defendants, and his experience with the sale and transfer of the rights to IP address blocks.

3)     <u>Mike Burns, Nationwide Computer Systems</u>

Mr. Burns is the Executive President of Nationwide Computer Systems ("Nationwide"). Mr. Burns' direct will be handled by AUSA Bower and is anticipated to last 30 minutes to 1 hour.

Mr. Burns' company is one of the brokerage companies that was involved in Defendants selling IP address block rights that were fraudulently obtained from ARIN. In 2017, Nationwide represented the buyer of a block of IP addresses from Oppobox, one of the Channel Partner companies. In July 2017, Nationwide was also involved in the negotiation of a sale of another block of IP addresses with Toipa Trading Company, another Company that Golestan created to facilitate his fraudulent scheme; however, this sale did not go through because Golestan terminated the deal. Burns will testify about the testify about the details of these transactions, his dealings with Defendants, and his experience with the sale and transfer of IP address blocks.

4)     <u>Hillary Stiff, Cheval Capital</u>

Ms. Stiff is the Director of Cheval Capital Incorporated and the President of Cheval M&A Incorporated. Ms. Stiff's direct will be handled by AUSA Bower and is anticipated to last 45 minutes to 1 hour.

Ms. Stiff's brokerage company is one of the brokerage companies that was involved in Defendants selling IP address block rights that were fraudulently obtained from ARIN. Ms. Stiff represented Defendants in the transactions. In 2017, Cheval Capital represented Defendants in the sale of a block of IP addresses from Oppobox, one of the Channel Partner companies, to a company represented by Nationwide and Mr. Burns. In July 2017, Cheval Capital represented the Defendants in the negotiation of a sale of another block of IP addresses with Toipa Trading Company, another Company that Golestan created to facilitate his fraudulent scheme; however,

this sale did not go through because Golestan terminated the deal. The potential buyer was represented by Nationwide and Mr. Burns.

Ms. Stiff also attempted to broker the sale of a block of IP addresses on behalf of Defendants to Amazon. The deal did not go through despite extensive negotiations because Golestan backed out. Ms. Stiff will testify about the testify about the details of these transactions, her dealings with Defendants, and her experience with the sale and transfer of IP address blocks.

5) <u>Sandra Brown, IPv4 Market Group</u>

Sandra Brown is the President of IPv4 Market Group. Ms. Brown's direct will be handled by AUSA Bower and is anticipated to last 30 minutes to 1 hour.

Ms. Brown's company is one of the brokerage companies that was involved in Defendants selling IP address block rights that were fraudulently obtained from ARIN. Ms. Brown brokered two deals for Golestan through Toipa Trading Limited, a company Golestan represented was Micfo's parent company. IP addresses blocks were brokered by Ms. Brown to NTTPC Communications Incorporated and Bahnof AB. Brown will testify about the details of these transactions, her dealings with Defendants, and her experience with the sale and transfer of IP address blocks.

6) <u>Melyssa Banda</u>

Ms. Banda is a former employee of Micfo. Ms. Banda's direct will be handled by AUSA Williams and is anticipated to last 30 minutes to 1 hour.

When employed at Micfo, Ms. Banda was the Chief Marketing Officer, and her primary responsibility was to generate new business, market the Micfo brand, and develop clients. Ms. Banda's testimony will include, but is not limited to, her understanding of the Channel Partner

11

companies and the interaction she had with the Channel Partner companies and fictitious persons created by Golestan.

7) <u>Matt Talarico</u>

Mr. Talarico is a former employee of Micfo. Mr. Talarico's direct will be handled by AUSA Williams and is anticipated to last 45 minutes to 1 hour.

While employed at Micfo, Mr. Talarico's responsibilities included sales, operations, and customer relations. Mr. Talarico's testimony will include, but is not limited to, his knowledge of Golestan's creation of the Channel Partner companies, and what acts Mr. Talarico performed on behalf of the fictitious individuals Golestan created for each of the Channel Partner companies.

8) <u>Victoria Latham</u>

Ms. Latham is a former employee of Micfo. Ms. Latham's direct will be handled by AUSA Bower and is anticipated to last 30 to 45 minutes.

While employed at Micfo, Ms. Latham was Golestan's executive assistant. Ms. Latham's testimony will include, but is not limited to, her knowledge about the efforts Golestan took to disguise that the Channel Partner companies were fictitious, the correspondence Golestan had Latham send to the fictitious persons he created for the Channel Partner companies, and her knowledge of the spreadsheet titled "Project G77" where Golestan tracked the Channel Partner companies.

9) <u>Scot Sledd – FBI</u>

Scot Sledd is an FBI Special Agent who resides in Nashville, Tennessee. Mr. Sled's direct will be handled by AUSA Williams and is anticipated to last 30 to 45 minutes.

Special Agent Sledd will testify regarding his attempted contact with one of Golestan's Channel Partner companies, Contina, and how he attempted to get in contact with a fictitious individual created by Golestan, Jordan Lieberman. Special Agent Sled will also testify that subpoenas were served on Ruby Receptionist, who was answering Contina calls, and Regus, a virtual office company that Contina had listed as its addresses, in an effort to determine who was paying for the accounts. Sled will testify how the use of fictitious Channel Partners delayed the service of process in cases involving national security, and that this was a common problem with other agents and in other investigations when dealing with fictitious Channel Partners.

10)     Brian Womble – FBI

Mr. Womble is the FBI Special Agent in charge of the investigation of Defendants. Mr. Womble's direct will be handled by AUSA Williams and is anticipated to last 1.5 to 2.5 hours. Mr. Womble will testify about his investigation into Defendants and statements made by Golestan. This will include statements made to SA Womble, to third parties including the media, and on a website set up by Golestan. SA Womble will present a timeline that incorporates the testimony and exhibits presented by ARIN and John Sweeting with later sales made by brokers to assist the Court with understanding which IP address rights were sold, attempted to be sold and when. SA Womble will also examine the timeline relating to Golestan's working with the Government and his status when dealing with various FBI agents. SA Womble will also present a timeline relating to Golestan's attempts to sell IP address rights and how those attempts were oriented in time to when he was trying to obtain them.

C.  **Exhibits**

The Government's exhibit list is being attached to this Trial Brief and the Government plans to provide the Court with a binder of exhibits no later than the Friday before trial. The Government reserves its right to edit and/or update the exhibit list in advance of trial. The witness that each exhibit will be admitted through is listed in a column on the attached exhibit list. The Government met with defense counsel Monday, November 8th and the parties have agreed to the admission of all the Government's exhibits listed on the attached exhibit list.[4]

D.  **Closing Statement**

AUSA Williams will present the Government's closing argument and rebuttal. The initial closing is anticipated to take approximately 45 minutes, and the rebuttal 20 minutes.

IV.  **Legal Authorities Pertinent to Issues that May Arise**

A.  **Charts/Demonstratives**

The United States may utilize charts and demonstratives in the opening statement. The purpose of an opening statement is to acquaint the Court[5] with the substance and theory of the case and to outline the forthcoming proof so that the Court may intelligently follow the testimony. When a chart or PowerPoint slide used to accompany an opening statement does no more than assist the Court or jury in understanding the proof they are about to hear, use of charts should be permitted. *See United States v. Sampler*, 368 Fed. Appx. 362, 365, 367 (4th Cir. 2010) (approving Government's use of "an illustrative chart featuring [photographs] in its opening statement"); *see*

---

[4] The Government and defense counsel are negotiating redactions of exhibit 5. Should the parties not agree on the totality of defense counsels' requested redactions, the parties will inform the Court.

[5] Defendants have waived their right to a jury trial.

14

*also United States v. DePeri*, 778 F.2d 963, 978 (3d Cir. 1985). This is particularly appropriate in a complex case such as this one that involves technical terms and numerical IP addresses.

      **B.**      **Summary Exhibit**

The Government intends to introduce a "summary" excel spreadsheet pertaining to the various IP address blocks that were granted to Micfo and the Channel Partners by ARIN. The summary spreadsheet contains the following information: (1) IP address ranges by originating company and corresponding exhibit where the ranges were granted to the originating company; (2) date ARIN gave approval for the rights to the IP address block; (3) If the originating company was a Channel Partner, alias name used on the ARIN application; (4) If the originating company was Micfo, Channel Partner company used for justification of IP address blocks and the number of IP addresses based on a Channel Partner; (5) buyer or attempted buyer of IP address block; (6) if the IP address was transferred by Micfo or a Channel Partner, the broker involved, exhibit number of the transfer documentation, the cost of the IP address, and the money obtained and/or anticipated money as a result of the transfer.

The use of "summary charts" is approved, and encouraged, especially when there are numerous documents or other items being summarized. *See, e.g.*, *United States v. Loayza*, 107 F.3d 257, 264 (4th Cir. 1997). "Summary charts are admissible if they aid the jury in ascertaining the truth. The complexity and length of the case as well as the numbers of witnesses and exhibits are considered in making that determination." *Id.* (citation omitted). Such charts and summaries are themselves the evidence under either Rule 611(a) or Rule 1006, so long as they will help the jury to better understand the evidence presented and to ascertain the truth. *See, e.g.*, *United States v. Johnson*, 54 F.3d 1150, 1162 (4th Cir. 1995); *United States v. Hayes*, 322 F.3d 792, 799 (4th Cir. 2003) (upholding admission of summary charts); *United States v. Porter*, 821 F.2d 968, 975

(4th Cir. 1987); *United States v. Keltner*, 675 F.2d 602, 605-06 (4th Cir. 1982). After admission, the charts and summaries may be used by the jury, or in the present case the Court, during its deliberation like any other piece of evidence.

The Government's proposed summary exhibits are admissible under both Rule 1006 and Rule 611(a). A Rule 1006 "summary, chart, or calculation" is admissible where the "contents of voluminous writings, recordings, or photographs ... which cannot conveniently be examined in court." Fed. R. Evid. 1006; *see generally United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004). While the evidence underlying such summaries must be admissible, it need not be admitted. *Id.* at 272-73. Summaries or charts that are based on the substantial audio, video, and photograph evidence provided in discovery in this case should be admitted pursuant to Rule 1006.

Independently, Rule 611(a) permits the introduction of charts that do not strictly comply with Rule 1006. In *Johnson*, the Fourth Circuit explained the contours of Rule 611(a) in admitting a summary organization chart based on trial testimony. 54 F.3d at 1162. *Johnson* explained that summaries were admissible even where an offered summary did not fall within Rule 1006 because testimony, and not voluminous documents or recordings, was summarized on the chart. *Johnson* then explained that Rule 611(a) permits the Court the discretion to admit as evidence charts that would be helpful to the jury in understanding the evidence. To protect against any prejudice, the Court suggested that the preparer of the chart be subject to cross-examination and that the trial court advise the jury that they are to determine whether the summary chart their responsibility to determine whether the charts accurately reflected the evidence presented.

To be admissible under Rule 611(a) the chart need only "help the jury to better understand the evidence presented and to ascertain the truth." *United States v. Pena*, 213 F.3d 634, 2000 WL 541087 (4th Cir. 2000) ("It is well-established that a district court may admit summary testimony

16

and summary charts, under Rule 611(a) of the Federal Rules of Evidence, if they will help the jury to better understand the evidence presented and to ascertain the truth."); *see United States v. Levy*, 2009 WL 1863687 (4th Cir. 2009) (applying same standard and finding no error in admission of summary charts in mail and wire fraud case); *Pena*, 2000 WL 541087, at *3-4 (same). [6]

### C. Government's Notice of Intent to Use Evidence as Evidence of the Charged Offenses, Intrinsic to the Charged Offenses, and/or Pursuant to Rule 404(b)

The Government filed its notice of intent to use the following evidence:[7]

> All evidence related to applications from Micfo, LLC to the American Registry of Internet Numbers ("ARIN") for the acquisition of IPv4 blocks that used a "Channel Partner" as justification for the acquisition need.

The primary argument of the government regarding the evidence set forth above is that such evidence is admissible as probative evidence relating to the Defendants' guilt of the counts charged in the Indictment. The evidence set forth above may be admissible as evidence intrinsic to the crimes charged or otherwise admissible pursuant to Rule 404(b).

---

[6] Although the chart or summary must accurately and fairly reflect the contents of the documents and testimony being summarized, there is no requirement that a chart include the opponent's version of the evidence or his theory of the case. *United States v. Ambrosiani*, 610 F.2d 65, 68 n.2 (1st Cir. 1979); *Myers v. United States*, 356 F.2d 469, 470 (5th Cir. 1966). The headings and captions on the summary chart may be grounded on assumptions about the underlying evidence, so long as the chart, and the assumptions in it, remain a summary of evidence. *United States v. Diez*, 515 F.2d 892, 905 (5th Cir. 1975). In light of this rule, the proponent of the chart has wide latitude in constructing her charts. *United States v. Lacob*, 416 F.2d 756, 762 (7th Cir. 1969)(chart upheld which used caption or heading "Total Net Unreported Income"); *Diez*, 515 F.2d at 905 (chart upheld which used caption or heading "Schedule of Sales, Net Taxable Gains to Peter A. Palori and Amounts Not Reported or Taxable Gain Reported by Others"); *United States v. Smyth*, 556 F.2d 1179, 1182-84 (5th Cir. 1977)(chart upheld which used caption or heading "falsified data" and "difference between original/false").

[7] ECF No. 90.

V.   **CONCLUSION**

The United States respectfully submits this Trial Brief for the assistance of the Court in this matter and will update the Court should any aspect of this Trial Brief change in advance of trial.

Respectfully submitted,

M. RHETT DEHART
ACTING UNITED STATES ATTORNEY

BY:   *s/      Amy Bower*

NATHAN S. WILLIAMS (ID#10400)
AMY F. BOWER (ID#11784)
Assistant United States Attorneys
151 Meeting Street, Suite 200
Charleston, SC 29401
843-727-4381

November 8, 2021

Charleston, South Carolina