IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 2:19-CR-00441-RMG |
| v.<br>AMIR GOLESTAN,<br>MICFO, LLC | **GOVERNMENT'S SUPPLEMENTAL MEMORANDUM PERTAINING TO CALCULATION OF LOSS** |

The United States of America submits this supplemental memorandum, as directed by the Court in its Order dated December 7, 2021, setting forth its analysis of who was victimized by Defendants' fraud for purposes the calculating loss under the Sentencing Guidelines.

### **FACTS PERTINENT TO LOSS CALCULATION**[1]

*Background Facts*

Defendants Amir Golestan (Golestan) and Micfo, LLC (Micfo) (collectively, Defendants) pled guilty on November 16, 2021 to twenty counts of wire fraud pursuant to 18 U.S.C. § 1343. ECF No. 105. Defendants' guilty pleas were entered after 1.5 days of trial. Defendants pled guilty to devising a scheme and artifice to defraud and obtain property, specifically IPv4 addresses from the American Registry for Internet Numbers (ARIN), by means of false and fraudulent representations.

*Government's Initial Memorandum Pertaining to Loss*

On December 3, 2021, the United States of America, through its undersigned attorneys, submitted its initial memorandum setting forth its calculation of loss and the legal and factual basis for its calculation (hereinafter referred to as "Initial Memorandum"). ECF No. 111. In its Initial

---

[1] For the purposes of this supplemental memorandum, the Government incorporates its factual summary contained in its initial memorandum that was filed on December 3, 2021. ECF. No. 111.

1

Memorandum, the Government set forth that Defendants fraudulently obtained or attempted to obtain at total of 1,339,272 IPv4 addresses from ARIN by creating false companies and fictitious persons to meet ARIN's justification requirements for IPv4 addresses. Defendants' fraudulent scheme ran from 2017 to the fall of 2018 when their fraud was discovered by ARIN. In the Government's Initial Memorandum, it set forth that Defendants' fraud was complete once ARIN issued the fraudulently obtained IPv4 addresses to Defendants and the value of the IPv4 addresses on the secondary market was the total intended loss because it was part of Defendants scheme to take these fraudulently obtained IPv4 addresses and profit on the secondary market. In Section II of its Initial Memorandum, the Government set forth five categories that the total 1,339,272 fraudulently obtained IPv4 addresses fit into for the purposes of ascertaining value. Once the value for each category was ascertained, either by reference to a specific contract for sale or by using a range, the total intended loss of Defendants' fraud was between $19,067,512 – $23,203,952.

*Evidence and Trial Testimony Pertinent to the Victim Analysis*

John Sweeting, Chief Consumer Officer for ARIN and Former Elected Chairman of the ARIN Advisory Council, testified at trial that ARIN has specific processes and policies that must be followed before rights to an IP address can be assigned or transferred. ARIN's Number Policy Resource Manual (NPRM) sets forth these processes and policies. Broadly speaking, for an organization to request IP resources and registration rights, it must submit a request to ARIN, provide documentation showing need for the resources in accordance with the NPRM, and enter into a registration services agreement (RSA) with ARIN. Because of the demand for IPv4 addresses, ARIN required justification and customer identification for additional IPv4 address blocks to verify that the request was valid.

In his trial testimony, Sweeting explained that ARIN often has a waitlist for IPv4 addresses due to the high demand and limited supply. The individuals or companies on this waitlist would have been either temporarily, or permanently, deprived of IPv4 addresses since they were allocated to Defendants. Although there was no analysis provided at trial regarding the actions of those behind Defendants on the ARIN waitlist, what was clear is that Defendants' fraudulent acts deprived those individuals or businesses from obtaining IPv4 address.

As was testified by Sweeting at trial, ARIN did not revoke the IPv4 addresses from the innocent third parties who purchased Defendants' fraudulently obtained IPv4 addresses. Even though ARIN chose to not harm these innocent purchasers, Sweeting testified at trial that ARIN could have revoked the IPv4 addresses. Further, it was clear from Sweeting's testimony that businesses purchasing illegally obtained IPv4 addresses were not getting what they bargained for from Defendants. Specifically, the purchasers were paying a premium on the secondary market for IPv4 addresses that could be reclaimed from ARIN, forfeited by the government, or that may have a diminished value when their actual status became known.

At trial, the Court also heard testimony from the following brokers: Jack Hazan, Mike Burns, Hillary Stiff, and Sandra Brown. Each broker that testified explained the demand for IPv4 addresses, the creation and utilization of the secondary market to obtain IPv4 addresses, and the increasing value of an IPv4 address. Importantly, all four brokers testified that had they been aware of the Defendants' fraud, they would not have been involved in each completed or attempted sale because it would harm their reputation and the reputation of the secondary market.

## LEGAL ANALYSIS[2]

When a defendant pleads guilty or is convicted of a fraud offense, including wire fraud pursuant to 18 U.S.C. § 1343, the United States Sentencing Commission's Guidelines Manual directs that the appropriate chapter and section to guide sentencing is § 2B1.1. The United States Sentencing Commission in Note 3 to § 2B1.1 has given sentencing courts guidance on how to calculate loss for the purposes of § 2B1.1(b). As set forth in the Guidelines Manual, loss is the greater of "actual" or "intended" loss. *Id.* at n. 3(A). The Guidelines Manual sets forth that a sentencing court "need only make a reasonable estimate of the loss." § 2B1.1 n. 3(C); *see also United States v. Stone*, 866 F.3d 219, 228 (4th Cir. 2017) (holding that the sentencing court need only make a reasonable estimation of loss and that the sentencing judge is in a unique position to assess the evidence).

In estimating loss, the Fourth Circuit has generally held that that "loss is determined by measuring the harm to the victim" of the offense committed. *See United States v. Ruhe,* 191 F.3d 376, 391 (4th Cir.1999). Thus, when sentencing a defendant under §2B1.1, a sentencing court must conduct a factual inquiry into the defendant's offense and, once the offense is ascertained, the sentencing court must determine "the loss that was intended to result from the offense" by focusing on "the intended victim or victims of the offense." *United States vs. Qazah,* 810 F.3d 879, 889-890 (4th Cir. 2015).

---

[2] To the extent a legal argument is not readdressed in this supplemental memorandum, the Government incorporates into this supplemental memorandum all legal arguments raised in its Initial Memorandum.

A. **The Fourth Circuit's holding in *Qazah* reminds district courts that they must conduct a factual inquiry into the victim or victims of an offense to adequately explain the court's determination of the appropriate loss amount for sentencing purposes.**

*United States vs. Qazah,* 810 F.3d 879 (4th Cir. 2015) examined how district courts should determine loss. In *Qazah*, the defendants were convicted of a conspiracy to "receive, transport, and sell stolen goods—specifically, over 8,000 cases of Marlboro cigarettes manufactured by Phillip Morris—in violation of 18 U.S.C. §§ 2314 and 2315." *Id.* at 889. The defendant's in *Qazah* were purchasing purportedly stolen cigarettes from undercover ATF agents. At sentencing, the district court had two definitive values for the stolen cigarettes: (1) the value to Phillip Morris (the wholesale value) and (2) the value the cigarettes sold for on the open market (the retail value). The retail value was higher than the wholesale value. At sentencing, the district court only considered the retail value of the stolen cigarettes, and sentenced defendants based on this value alone based on retail value being higher than the wholesale value. *Id.* at 888. On appeal, the defendants argued that the retail value was an improper measure of loss, and the stolen cigarettes wholesale value should have been used for sentencing purposes.³ *Id.*

In the Fourth Circuit's opinion, it took issue with the fact that the district court only analyzed the "greater intended loss" pursuant to the guidelines without an analysis how this amount related to the factual circumstances presented and what was taken away from a victim. *Id.*

---

³ In *Qazah*, both parties agreed that intended loss vs. actual loss was the relevant measure so there was no discussion on appeal regarding which loss was greater, intended or actual. 810 F.3d at 888. In the present case, should the Court believe it needs to conduct an analysis on intended vs. actual loss, the Government would set forth that the actual loss and intended loss are not mutually exclusive and may be combined to calculate overall intended loss. *See United States v. Sesay*, 937 F.3d 1146, 1153 (8th Cir. 2019) (finding that the district court properly included the actual loss suffered with the total intended loss for the purposes of determining loss amount under §2B1.1); *see also United States v. Ware*, 334 F. App'x. 49, 50-51 (8th Cir. 2009) (finding that intended loss includes both actual losses and the intended loss from the fraud).

5

at 890.  A review of the sentencing transcript for Mr. Qazah evidences that his lawyers took the position that the correct calculation of loss was the wholesale value of the cigarettes.  Specifically, there was a factual discrepancy between the Government and Mr. Qazah's counsel as to how intended loss should be calculated.  *See United States vs. Qazah,* 3:11-cr-00373-FDW-DSC-3, ECF No. 517 (W.D.N.C).  In its determination that retail value was the appropriate measure of loss, the district court did not conduct an inquiry of the intended victim or victims of the defendants' offense.  *Qazah*, 810 F.3d at 890.  Had the cigarettes actually been stolen, the manufacturer, Phillip Morris, would have been the "most obvious intended victim" of the crime.  *Id.* at 889.  However, the cigarettes were not actual stolen, so the loss amount required an inquiry into who the victims of the defendants' offenses were. The Fourth Circuit also held that in addition to potential legitimate retailers and the manufacturer, there could have been additional victims to the crime.  *Id.* (explaining that states denied cigarette taxes from the illegal sales could also be intended victims of defendants' offenses).  As a result of the lack of inquiry into the victims on the record, the Fourth Circuit remanded the case for resentencing to "allow the district court to expand its inquiry into the intended victim or victims of the relevant offenses and to recalculate the defendants' sentencing ranges based on its findings and conclusions about the amount of loss that they intended to result from their commission of the offense or offenses." *Id.* at 890.  Importantly, the Fourth Circuit did not conclude that the use of retail value was incorrect, it merely held that "the district court did not explain how the retail value represented loss." *Id.*

      **B.**    <u>**An analysis of the intended victims of Defendants' offenses and the loss calculation for sentencing purposes.**</u>

The impact of the *Qazah* holding on the present case is a reminder to this Court that it must conduct a factual inquiry into the intended victim or victims of the Defendants' offenses to adequately explain how it arrives at its "reasonable estimation of loss."  810 F.3d at 888-90.  Under

the broad *Qazah* framework, this Court must determine who the intended victims were of the Defendants' offenses and then estimate the "pecuniary harm that the Defendant purposefully sought to inflict." *Id.*; §2B1.1 n. 3(A)(ii). While *Qazah* provides the framework that this Court must use in estimating loss, *Qazah* presented very different facts. For instance, *Qazah* presented two clear amounts, wholesale and retail value. As the Court of Appeals directed, other amounts such as lost taxes could have been possible. However, the district court did not explore the intended victims and the potential loss attributed to each victim; instead, the district court used the greatest loss amount, the retail amount, and it is this lack of inquiry that resulted in the Fourth Circuit remanding the case. *Id.*

In the present case, there are three identifiable, or intended victims, of the Defendants' offenses: (1) ARIN; (2) those on the "waitlist" who were deprived, either permanently or temporarily, of the right to get IPv4 addresses from ARIN because they were allocated to the Defendants; and (3) legitimate third-party purchasers who purchased Defendants' fraudulently obtained IPv4 rights. Once the intended victims are ascertained, the Court must then determine the appropriate measure of loss. *See Qazah,* 810 F.3d 879 at 889. Further, as stated above, this Court need only make a "reasonable estimate" of loss. § 2B1.1 n. 3(C); *see also. Stone*, 866 F.3d at 228 (holding that the sentencing court need only make a reasonable estimation. The intended loss attributable to each category of victims is discussed in greater detail below.[4]

### 1. ARIN is an intended victim of Defendants' offenses.

The first, and most obvious, victim in this case is ARIN. Defendants, and the fictitious Channel Partner companies, were granted rights to IPv4 addresses based on the fraudulent

---

[4] The Government would also refer the Court to its Initial Memorandum pages 9-11 for the full briefing of loss calculation.

representations to ARIN.  At trial, Sweeting testified regarding the impact Defendants' fraud had on ARIN, and he further testified that Defendants would not have been issued the IPv4 address rights but for the fraudulent statements.  In Defendants' guilty plea, Defendant Golestan acknowledged to the Court, on behalf of himself and Micfo, LLC, that Defendants created a scheme to defraud ARIN.  Specifically, Golestan agreed that he created false companies and persons to meet ARIN's justification requirements for issuance of IPv4 addresses.  Moreover, it was revealed through testimony at trial that Defendants, and the fictitious Channel Partner companies, were granted the rights to IPv4 addresses from ARIN's waitlist.  In fact, Defendant Golestan was so aware of ARIN's waitlist and the demand for IPv4 addresses that he backed out of a contract with Tencent because he did not want to jeopardize his spot on ARIN's waitlist for some of the Channel Partner Companies.[5]

      Although ARIN is not in the business of buying and selling IPv4 addresses, this does not mean the address rights do not have a value to ARIN for the purposes of sentencing.  Were ARIN to sell their IPv4 assets, there is a clear value, which was established at trial through broker testimony.  Moreover, the value of the total number of IPv4 addresses fraudulent obtained, or attempted to be obtained, by Defendants is the appropriate loss amount for sentencing because, as explained by Sweeting at trial, the entirety of Defendants fraud harmed ARIN.  Based on this testimony, as the Fourth Circuit did with Phillip Morris in *Qazah,* the district court should look at the price ARIN would have received should it have attempted to sell its assets during the time

---

[5] The Government would refer the Court to its Exhibits 72 and 80.  Specifically, Exhibit 80 contains the email correspondence between Golestan and Hillary Stiff as to why he was backing out of the first Tencent contract because of the position certain Channel Partner companies were on ARIN's waitlist.

Defendants perpetrated their fraud, which results in an intended loss between $19,067,512 – $23,203,952.[6]

### 2. Those who were permanently or temporarily deprived of the right to IPv4 addresses from ARIN were intended victims of Defendants' offenses.

The second group of intended victims of Defendants' offenses are those entities and persons who were deprived, either permanently or temporarily, of the rights to the 1,077,130 IPv4 addresses that Defendants successfully obtained through their fraud. Sweeting testified that during the time Defendants perpetrated their fraud on ARIN, ARIN's pool of IPv4 addresses was depleted and there was a waitlist. Essentially, third parties were temporarily or permanently deprived from obtaining IPv4 addresses because Defendants had been allocated the rights to the 1,077,130 IPv4 addresses based on fraudulent representations to ARIN. In Defendants' guilty plea, Golestan agreed that he sold and attempted to sell the fraudulently obtained IPv4 addresses on the secondary market for a profit. *See* ECF No. 2.

Although it is not clear from the testimony at trial how many individuals on ARIN's waitlist were permanently or temporarily deprived of IPv4 address rights because of Defendants' offenses,[7] this Court can reasonably conclude, based on the testimony at trial that ARIN had a waitlist during the time Defendants perpetrated their fraud and Defendants' guilty plea, that the value of the IPv4 addresses Defendants obtained from ARIN is "pecuniary harm" that Defendants "purposefully sought to inflict" to this group of victims. *See* §2B1.1 n. 3(A)(ii). Other applicants were, at the very least, significantly delayed on the waitlist because of Defendants' fraud, may not

---

[6] The Government would refer the Court to its Initial Memorandum pages 9-11 for the full briefing of loss calculation.

[7] This number can be further developed at sentencing should it be deemed necessary.

9

have requested addresses based on the increased wait time, or may have never received any block of IPv4addresses because of the length of wait caused by Defendants. The loss amount for this category of victims, using the range that is fully briefed in the Government's Initial Memorandum, is between $16,708,234 - $18,223,254.[8]

### 3. Innocent third-party purchasers who purchased IPv4 address rights from Defendants are intended victims of Defendants' offenses.

The third group of victims of Defendants' offenses are those who purchased IPv4 address rights from Defendants. At trial Sweeting testified that every fraudulently obtained IPv4 address that Defendants sold and transferred the rights to could have been revoked by ARIN. Even though ARIN did not reclaim the sold IPv4 addresses from innocent third-party purchasers, it is clear ARIN held the power to do so. Moreover, it is clear from ARIN and broker testimony that stolen and subsequently sold IPv4 addresses had potentially no value; however, at a minimum, they are less valuable than what the purchasers paid on the secondary market. Based on this, the potential loss to those who purchased, or had a contract to purchase,[9] the stolen addresses is the value of their asset purchase agreement, which is $9,756,842.[10] The only reason this loss was not realized is because of ARIN policy and the lack of forfeiture efforts by the Government.

For this group of victims, Government would set forth that the actual loss and intended loss are not mutually exclusive and may be combined to calculate overall intended loss. *See United States v. Sesay*, 937 F.3d 1146, 1153 (8th Cir. 2019) (finding that the district court properly

---

[8] The Government would set forth that this is the value for the total number of IPv4 addresses that Defendants' fraudulent obtained and is derived by subtracting category "E" on page 11 of the Government's Initial Memorandum from the total loss amount of $19,067,512 – $23,203,952.

[9]

[10] The Government would refer the Court to its Initial Memorandum, page 9 and the summary on page 11.

10

included the actual loss suffered with the total intended loss for the purposes of determining loss amount under §2B1.1); *see also United States v. Ware*, 334 F. App'x. 49, 50-51 (8th Cir. 2009) (finding that intended loss includes both actual losses and the intended loss from the fraud). Therefore, for the purposes of calculating loss for this group of victims, it is appropriate to combine the completed sales and the Saudi Telecom sale that was funded but did not ultimately go through based on ARIN's discovery of Defendants' fraud.

## CONCLUSION

As set forth herein, ARIN, those who were permanently or temporarily deprived of the right to IPv4 addresses from ARIN because they were allocated to the Defendants, and innocent third-party purchasers are the intended victims of Defendants' offenses. The reasonable estimate of the intended loss to the victims, based on the fair market value of the IPv4 addresses during the time the Defendants perpetrated their fraud, varies based on which victim category is being analyzed; however, the greatest intended loss is between $19,067,512 – $23,203,952.

                                          Respectfully submitted,

                                          M. RHETT DEHART
                                          ACTING UNITED STATES ATTORNEY

                                          BY:   *s/     Amy Bower*
                                            NATHAN S. WILLIAMS (ID#10400)
                                            AMY F. BOWER (ID#11784)
                                            Assistant United States Attorneys
                                            151 Meeting Street, Suite 200
                                            Charleston, SC 29401
                                            843-727-4381

December 21, 2021
Charleston, South Carolina