# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Criminal. No.:  2:19-441 |
| | ) | |
| | ) | |
| vs. | ) | Motion to Continue |
| | ) | Sentencing |
| Amir Golestan, | ) | |
| Defendant. | ) | |
| | ) | |

Amir Golestan entered a guilty plea to Counts 1-20 of his indictment on November 16, 2021. ECF 105. His sentencing has been scheduled for May 2, 2023. ECF 170. Because the outcome of a case currently awaiting decision in the Supreme Court of the United States, *United States v. Ciminelli*, No. 21-1170 may give Mr. Golestan a reason to move to withdraw his guilty plea, he asks that his sentencing be continued until the *Ciminelli* case has reached its conclusion.

**I.**     ***United States v. Ciminelli, No. 21-1170***

Louis Ciminelli participated in a bid-rigging scheme directed at receiving a contract from New York State for construction projects. These projects were funded by a billion-dollar initiative to invest in the Buffalo area. Fort Schuyler Management Corporation was the non-profit in charge of vetting and selecting companies to receive contracts under this initiative.

Ciminelli worked with Alain Kaloyeros, a member of Fort Schuyler Management Corporation's Board of Directors, to steer the Fort Schuyler Board towards Ciminelli's company by tailoring requirements for companies to factors

specific to Ciminelli's company. One request for proposals contained specifications unique to Ciminelli's company, such as a 50-year experience requirement and a requirement the preferred developer be headquartered in Buffalo.

The Fort Schulyer Board ultimately selected Ciminelli's company to receive a construction contract worth $750 million. The rest of the Board was unaware of Ciminelli's ties to Kaloyeros and his work with him when they did this.

At his trial, the government's theory was that Ciminelli deprived Fort Schulyer of important information in its vetting and selection process—namely, his ties to Kaloyeros. The jury found Ciminelli guilty of conspiracy and substantive wire fraud charges. Ciminelli was sentenced to 28 months of imprisonment, to be followed by 2 years of supervised release. He appealed, and the 2nd circuit affirmed.

The Second Circuit stated "[i]n a right-to-control case, 'it is not necessary that a defendant intend that his misrepresentation actually inflict a financial loss—it suffices that a defendant intend that his misrepresentations induce a counterpart to enter a transaction without the relevant facts necessary to make an informed economic decision." Petitioner Brief at 7. It also pointed out that prohibited conduct was "schemes that depend for their completion on a misrepresentation of an essential element of the bargain." *Id*. The informational deprivation in the bidding process was all the government needed to show harm to property.

In his opening brief to the Supreme Court, Ciminelli argued an informational deprivation, alone, is not the same thing as a deprivation of money or property. *Id*. at 9. Therefore, informational deprivation does not satisfy the requirements of

federal fraud liability—mail and wire fraud statutes extend only to schemes to deprive someone of money or property. There is no property right to make informed economic decisions. Withholding potentially valuable economic information does not automatically deprive a victim of property.

The Supreme Court heard oral argument on November 28, 2022. The justices generally agreed that the Second Circuits right-to-control theory was problematic.[1] The broader question the Court could address in an opinion would be the appropriate limits to the federal wire fraud statute.[2]

## II.  Golestan

Amir Golestan was the owner of Micfo, a company whose business depended on providing internet services to small and enterprise businesses. In order to connect Micfo's customers to the internet, the company required hundreds of thousands of internet protocol (IP) numbers. Having presided over a bench trial in this matter, the Court is well aware of, and the record is replete with the mechanics of the internet protocol system. In summary, use of the IP numbers required by every device that connects to the internet is determined throughout the world by regional internet number registries. The internet registry for the region that includes the United States, ARIN, leases blocks or large groups of internet protocol numbers to business and individual entities. While a significant secondary market

---

[1] https://www.scotusblog.com/2022/11/in-new-york-bid-rigging-case-justices-are-dubious-of-the-right-to-control-theory-of-fraud/
[2] *Id.*

for these IP number blocks exist, within ARIN the cost of the numbers or blocks does not depend on market forces.

Here, the evidence produced at trial—much of which was acknowledged by Golestan in his pretrial brief—demonstrated that Golestan concealed his identity as the owner of several business entities in order to continue obtaining IP number blocks from ARIN after his company's access to the numbers was substantially curtailed in or around 2014, based on suspicions that one or more of Micfo's clients was using Micfo-controlled IP numbers to engage in spam and other harmful internet conduct. With Micfo's ability to continue to grow and service existing clients in jeopardy, Golestan developed "channel partner" companies, which were subsidiaries of Micfo (but which also had unique clients and business offerings to Micfo). Golestan concealed the fact that he was the owner of these entities by developing fictitious personas to lead, control, and communicate on behalf of the channel partner entities.

By so doing, Golestan was able to request and receive additional large blocks of IP numbers on behalf of the channel partners. There is no dispute whether ARIN was deceived as to the identity of the owner of the channel partners. There is no dispute whether ARIN would have withheld the IP number blocks from any Golestan-controlled entities. There is no dispute that ARIN received the same payment for these number blocks from Golestan as it would have received from any other entity. Like in *Ciminelli*, the government's theory at trial in Golestan did not depend on actual monetary loss, but the idea of informational deprivation in

4

obtaining a thing. In Golestan's case the informational deprivation would be his identity as the owner of Micfo's channel partner properties, in Ciminelli's case the information deprivation would be his relationship with Kaloyeros. In Golestan's case the thing sought was IP number blocks from Arin, and in Ciminelli's case a contract. Because there was no loss to ARIN, as in the Ciminelli case, the outcome of the Supreme Court's consideration of that case bears directly on this case.

### III.     Conclusion

There are enough similarities between the government's theory of Golestan's culpability and Ciminelli's argument to cause Mr. Golestan to reconsider his allocution of guilt. It is not that Mr. Golestan disagrees he factually did what the government says he did, but that what he did may no longer, after *Ciminelli*, meet the statutory definition of fraud. In an effort to get things right on the front end, he asks for this Court to stay his sentencing until *Ciminelli* is decided. At that time he will be able to make an informed and reasoned decision with whether or not he should move to withdraw his guilty plea or proceed with sentencing.

Respectfully submitted,

*/s/ Alicia Vachira Penn*
Assistant Federal Public Defender
145 King Street, Suite 325
Charleston, SC 29402

April 18, 2023